In re Elwyn Ray JONES and Twilla Jean Jones, Debtors.

CENTRAL NATIONAL BANK OF SAN ANGELO, Plaintiff,

v.

Elwyn Ray JONES, et al., Defendants.

No. 683–00082.
Adv. No. 685–6009.

United States Bankruptcy Court,
N.D. Texas,
San Angelo Division.

March 11, 1986.

E. Dwain Psencik, Logan, Lewis, Symes & Keeling, San Angelo, Tex., for plaintiff, Central Nat. Bank of San Angelo.

Cole B. Parker, Dallas, Tex., for trustee.

Scott C. Larsen, Vineyard, Drake & Miller, Dallas, Tex., for Michael Cass.

## MEMORANDUM OF DECISION

MICHAEL A. McCONNELL, Bankruptcy Judge.

Plaintiff, CENTRAL NATIONAL BANK OF SAN ANGELO ("the Bank"), brings this interpleader action under Rule 7024 of the Bankruptcy Rules seeking protection

from potential conflicting claims to funds on deposit in various accounts at the Bank totalling approximately $43,474.00. Trial was held before the Court on February 7, 1986; and the Court, having heard the evidence and having reviewed the post-trial briefs of the parties, now enters the following findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules:

STIPULATED FACTS [1]

1. Neither Ray Jones nor Twilla Jones is a signatory on any of the "Accounts".[2]

2. None of the Accounts are styled or established in the name of Ray Jones or Twilla Jones.

3. None of the funds on deposit in the Accounts is claimed by Ray Jones or Twilla Jones.

4. Ray Jones has no interest in the Accounts.

5. Twilla Jones has no interest in the Accounts.

6. Ray Jones and Twilla Jones were divested of any interest in the Accounts by the express terms of the Final Judgment.[3]

7. North American Technology Corporation ("NATC") commenced a Chapter 11 bankruptcy proceeding on August 23, 1985 which was converted to a Chapter 7 bankruptcy proceeding on December 19, 1985, BK No. 385–32148, in the Northern District of Texas, Dallas Division. The Trustee for NATC is Don Navarro ("the Trustee").

8. North American Brokerage Corporation ("NABC") commenced a Chapter 11 bankruptcy proceeding on October 3, 1985 which was converted to a Chapter 7 bankruptcy proceeding on December 19, 1985, BK No. 385–32580, in the Northern District of Texas, Dallas Division. The Trustee for NABC is Don Navarro.

9. North American Leasing Corporation ("NALC") commenced a Chapter 11 bankruptcy proceeding on October 3, 1985 which was converted to a Chapter 7 bankruptcy proceeding on December 19, 1985, BK No. 385–32582, in the Northern District of Texas, Dallas Division. The Trustee for NALC is Don Navarro.

10. North American Software Corporation ("NASC") commenced a Chapter 11 bankruptcy proceeding on October 3, 1985 which was converted to a Chapter 7 bankruptcy proceeding on December 19, 1985, BK No. 385–32581, in the Northern District of Texas, Dallas Division. The Trustee for NASC is Don Navarro.

11. Zion Corporation, a Texas corporation formed by Michael Cass ("Cass"), was his alleged nominee to act in conjunction with matters relating to the Final Judgment. Zion Corporation was the general manager and sole director of NALC, NABC, NATC and NASC prior to their filing bankruptcy.

---

**1.** The Stipulated Facts are taken from Article III of the Pre-Trial Order entered by this Court on February 10, 1986.

| Account No. | Name of Account |
| --- | --- |
| 003–912–8 | North American Speed Math I |
| 003–926–8 | North American Technology Corp. |
| 003–866–0 | North American Leasing Corp. |
| 013–719–7 | North American Dental Billing, Ltd. |
| 013–718–9 | North American Medical Billing, Ltd. |
| 003–946–2 | North American Speed Reading–I, Ltd. |
| 013–722–7 | North American Data Base–I |
| 003–913–6 | North American Software Corp. |

**2.** "Accounts" is defined in ¶ 1.304 of the Pre-Trial Order as those certain accounts held by the Bank which are listed below:

**3.** The term "Final Judgment" referred to in Finding No. 6 is defined in ¶ 1.303 of the Pre-Trial Order as "that certain Judgment entered in Adversary Proceeding No. 684–6006 styled *Frank Cass and Michael Cass d/b/a Cass Oil Company v. Elwyn Ray Jones, et al.,* 50 B.R. 911, in the above-styled and numbered bankruptcy proceeding dated July 9, 1985."

12. The Final Judgment was appealed by Ray Jones to the United States District Court, San Angelo Division; but the appeal has now been dismissed by the Honorable Halbert O. Woodward and the Final Judgment is now final and unappealable.

13. The Final Judgment has a *res judicata* and collateral estoppel effect, against the parties thereto and their privies, as prescribed by law.

14. The attorneys for the Bank were provided with a copy of the Final Judgment by letter dated July 27, 1985 from the attorney for Cass.

15. A letter dated August 13, 1985 was sent to and received by the Bank (the "August 13 Letter") advising the Bank that:

A. Zion Corporation was the sole stockholder of NALC and NABC and the majority stockholder of NATC and NASC;

B. The authority of any former officer or director to sign on the Accounts had been revoked; and

C. The Bank was not to honor or pay any checks, drafts, notes, or orders drawn on any of the Accounts by any former officer or director.

D. The accounts addressed in the August 13 Letter include all of the Accounts.

16. On September 20, 1985, James Schroeder on behalf of NALC, NABC, NATC and NASC presented corporate resolutions to the Bank to close the Accounts and issue cashier checks payable to each entity. The corporate resolution presented on behalf of NABC was unsigned and uncertified. The corporate resolutions presented on behalf of NALC, NATC and NASC were executed and certified originals.

17. The Bank, at no time prior to the presentation of corporate resolutions as described in Stipulation 16 above, advised Cass, Zion Corporation, its officers, directors, attorneys or other representatives that the Bank had knowledge of any claim by any third party to the Accounts or that the Bank would not honor the directions contained in the August 13 Letter.

18. On September 20, 1985, the Bank refused to honor the directions contained in the corporate resolutions of NALC, NABC, NASC and NATC to close the Accounts and deliver the funds on deposit in the Accounts as directed thereby.

19. The amounts in the Accounts as of September 20, 1985 were as follows:

| Account No. | Name of Account | Balance on 9/20/85 |
|---|---|---|
| 003–912–8 | North American Speed Math I | $ 3,603.89 |
| 003–926–8 | North American Technology Corp. | 12,076.57 |
| 003–866–0 | North American Leasing Corp. | 83.85 |
| 013–719–7 | North American Dental Billings, Ltd. | 2,434.46 |
| 003–946–2 | North American Speed Reading–I, Ltd. | 5,894.93 |
| 013–718–9 | North American Medical Billing, Ltd. | 2,448.72 |
| 013–722–7 | North American Data Base–I | 5,172.02 |
| 003–913–6 | North American Software Corp. | 11,764.72 |

20. On September 24, 1985, the Bank allegedly exercised its alleged right of offset against all amounts in Account No. 003–866–0 on an alleged pre-existing corporate obligation of NALC and against $10,358.77 of the amount in Account No. 003–913–6 on an alleged pre-existing corporation obligation of NASC.

21. The expense to Zion Corporation to send James Schroeder to San Angelo on behalf of the Corporations and the Partnerships to close the Accounts is $430.15.

22. The Court can determine the amount of reasonable attorneys fees and costs incurred in connection herewith based upon the documentation thereof submitted to the Court after trial on the merits by the

attorneys which the Court finds are entitled thereto.

23. The Bank possessed written information in its files furnished in connection with the opening of the Accounts which reflected that NATC was the general partner of Speed Reading, Dental Billing and Medical Billing; that either NALC or NATC was the general partner of Speed Math; and that said partnerships were represented to the Bank to be limited partnerships.

24. The only corporate resolutions which the Bank had relating to the Accounts, other than those presented September 20, 1985, were as follows:

A. NALC:

(i) Corporate Resolution dated March 27, 1981; and

(ii) Corporate Resolution dated January 2, 1985.

B. NABC:

(i) Corporate Resolution dated January 4, 1982; and

(ii) Corporate Resolution dated January 2, 1985.

C. NATC:

(i) Corporate Resolution dated October 13, 1983; and

(ii) Corporate Resolution dated January 2, 1985.

D. NASC:

(i) Corporate Resolution dated October 13, 1983.

25. No certificate of limited partnership has been filed with the Texas Secretary of State regarding any of the Partnerships.

26. The Bank holds limited contracts of guaranty executed and delivered by the Investors which guaranteed in part the payment of the loans made by the Bank to certain Partnerships.[4]

27. The Internal Revenue Service, Abusive Tax Shelter Section, is conducting an investigation into the circumstances surrounding the Partnerships and an audit of same as abusive tax shelters.

28. The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, after considering the Motion Requesting Relief from Automatic Stay filed by the Bank in the NALC, NASC, NABC and NATC bankruptcies and after hearing the oral argument, entered an "Order Granting Relief from Automatic Stay" on January 10, 1985 in each of said bankruptcies which modifies the automatic stay in each case so as to allow Debtors to be served with process in this Adversary Proceeding, and so as to allow the litigation and final determination of the issues raised herein.

29. The U.S. District Court for the Northern District of Texas, San Angelo Division, after considering the Motion of Certain Defendants to Withdraw Reference Thereof and Brief in Support Thereof and further considering the response and memorandum brief of the Bank in opposition thereto, on January 31, 1986 entered its Order in Civil Action No. CA–6–85–0132, Adversary No. 685–6009, Bankruptcy Case No. 683–00082, denying said Motion.

30. The U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, after considering the Motion to Abstain and Brief in Support Thereof, and after hearing argument in open court from Plaintiff and Defendants, entered on October 23, 1985 its "Order Dismissing Without Prejudice", Adversary No. 385–3737 filed in Bankruptcy Case No. 385–32148.

31. The funds in the Accounts were maintained in money market accounts by the Bank and the funds deposited with the Court included interest paid thereon from September 20, 1985 through the date of deposit into the registry of this Court at the rate of 6.75% per annum.

32. As a result of the change in ownership effected by the Final Judgment, the Bank through its attorneys opened the records of the Bank regarding the Corporations and the Partnerships to Cass, acting

---

**4.** The term "Investors" is defined in ¶ 1.308 of the Pre-Trial Order to mean the 24 individuals named as defendants in this action who invested in the various Partnerships. "Partnerships" is further defined in ¶ 1.306.

by and through his attorneys, on August 19, 1985.[5]

33. On September 20, 1985, the Bank was a party Defendant in the then pending Adversary Proceeding No. 385–3737, filed in Bankruptcy Case No. 385–32148–M in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. (Bank Exhibit 1) The Complaint was filed on August 29, 1985 by Cass, NATC and the Partnerships against the Bank and several other defendants, and seeks damages and injunctive relief for alleged wrongful foreclosure of certain certificates of deposit by the Bank on August 16, 1985.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and parties to this proceeding pursuant to 28 U.S.C. § 1334(b). The instant interpleader action is a "related" proceeding as defined by 28 U.S.C. § 157(c)(1). The Bank, the Trustee and Cass (the remaining parties to this proceeding after defaults and disclaimers) have consented to the entry of a Final Judgment by this Court and have affirmatively waived their right under 28 U.S.C. § 157(c)(1) to require the Bankruptcy Judge to submit proposed Findings of Fact and Conclusions of Law to the District Court.

2. This Adversary Proceeding is "related" to the bankruptcy proceeding of Ray Jones and Twilla Jones for purposes of Sections 1334 and 157 of Title 28 in that Cass and the Trustee would not have any interest in the funds *but for* the entry of the Final Judgment by this Court in Adversary No. 684–6006 involving controversies between Cass and Ray Jones.

3. In this Court's Final Judgment, the Court declared the Corporations involved herein to be sham corporations and alteregos of Ray Jones.[6] Cass was awarded a constructive trust on the assets of NALC and NABC and a constructive trust as to a portion of the assets of NATC and NASC. Cass was also awarded all or a majority of the stock of the respective Corporations. In turn, Michael Cass exercised his rights as majority or sole shareholder to then place the Corporations into voluntary bankruptcy proceedings in the Dallas Division of the United States District Court for the Northern District of Texas where Cass resides. Through the direction of Michael Cass and his agent James Schroeder, the Corporations then made demand upon the Bank for return of the funds in the account. In other words, Michael Cass is the ultimate beneficiary of the Court's ruling in this interpleader action as he was in the previous Adversary Proceeding tried in this Court resulting in the Final Judgment.

4. Although not referenced in its Complaint, the Bank necessarily has interplead the funds pursuant to Bankruptcy Rule 7022 which incorporates by reference Rule 22(1) of the Federal Rules of Civil Procedure. Rule 7022 allows a party who is or may be exposed to double or multiple liability to join all adverse claimants as defendants and interplead the subject property. "Adversity" is demonstrated where the risk of double payment on a single liability exists or where the claims exceed the Movants liability limits. *InterFirst Bank Dallas v. Purolator Courier Corporation*, 608 F.Supp. 351, 353 (N.D.Tex. 1985).

5. In determining whether or not the Bank acted properly, the burden is on the Bank to demonstrate that it had a legitimate fear of multiple demands or claims against a single fund. Professor Wright explained this requirement in 7 Wright & Miller, Federal Practice and Procedure: Civil § 1704 as follows:

> The primary test for determining the propriety of interpleading the adverse claimants and discharging the stakeholder (the so-called "first stage" of interpleader) is whether the stakeholder legitimately

---

5. The term "Corporations" as used herein was defined in ¶ 1.305 of the Pre-Trial Order to collectively mean NATC, NALC, NASC and NABC.

6. The Memorandum Opinion in support of the Final Judgment is reported in its entirety in *In Re Jones*, 50 B.R. 911 (Bankr.N.D.Tex.1985).

fears multiple vexation directed against a single fund. Courts have expressed this standard with varying language, but most stress that the vexation and expense of possible multiple litigation warrants the use of interpleader even absent a substantial danger of multiple liability. Similarly, it is thought that the stakeholder should not be compelled to run the risk of guessing which claimant may recover from the fund."

In this case, the Court finds as a matter of fact and law that the Bank has met its burden of proof of showing a risk of double payment on a single liability and a bona fide fear of multiple demands or claims.

■ 6. The Bank could not, in good faith, comply with the directions contained in the corporate resolutions presented to it by James Schroeder on September 20, 1985 because of its knowledge of the various potential claims which might be asserted by the persons listed below to the funds held in the Accounts:

A. The legitimacy of the Bank's fear is demonstrated by the following facts. On September 20, 1985, the Bank was a party Defendant in the then pending Adversary Proceeding No. 385–3737, filed in Bankruptcy Case No. 385–32148–M in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (Bank Exhibit 1). The Complaint filed therein sought actual and punitive damages against the Bank for alleged wrongful foreclosure of certain certificates of deposit. Cass and his representatives would have had no standing to assert claims against the Bank "but for" this Court's Final Judgment. Having already been sued by Cass, the Bank certainly had a valid fear of further litigation.

B. Each of the entities named on the signature cards for each of the Accounts held a potential claim to the funds in each respective account under the terms contained therein and under the provision of the Texas Uniform Commercial Code;

C. Michael Cass held a potential claim to some, but not necessarily all of the funds held in the Accounts;

D. The individual investors in Dental Billing, Medical Billing, Speed Math, Speed Reading, and Data Base held potential claims to the funds in the account of each respective purported limited partnership;

7. All potential demands and conflicting claims to the interplead funds have now been resolved. Several of the defendants have filed disclaimers to the fund. (See ¶ 2.501 of the Pre-Trial Order) Additionally, several defendants defaulted and Partial Default Judgments have been entered against them. (See ¶ 2.601 of the Pre-Trial Order) It is now clear and undisputed that Mr. Don Navarro, Trustee of the Corporations involved herein is the legitimate owner of the funds and Judgment should be entered directing the Bank to pay the funds to Mr. Navarro as Trustee of the Corporations.

8. The only issue remaining before the Court is whether the prevailing claimants are entitled to an award of attorney's fees and costs. The Bank also contends that it is entitled to attorney's fees and costs as an innocent stakeholder for bringing the interpleader action.

■ 9. As a general rule, the decision to award attorney's fees and costs in an interpleader action to the stakeholder is an equitable matter entrusted to the sound discretion of the trial court. *Murphy v. Traveler's Insurance Co.*, 534 F.2d 1155, 1164 (5th Cir.1976). In this regard, banks and insurance companies are to be distinguished from other stakeholders. It is a cost of doing business and a matter of self interest for banks to use the salutary benefits of an interpleader action to avoid multiple liability. Moreover, fees should not be awarded when the controversy surrounding the interplead fund is not difficult to resolve. *Prudential, Etc. v. Baton Rouge, Etc.*, 537 F.Supp. 1147, 1150 (M.D.Ga.1982).

■ 10. In this case, the Bank seeks an award of attorney's fees and costs in the

amount of $9,843.91. In this case, this Court exercises its discretion to deny the Bank any award of attorney's fees and/or costs. The Court's reasoning in *Minnesota Mutual Life Ins. Co. v. Gustafson*, 415 F.Supp. 615, 618–619 (D.Ill.1976) concerning insurance companies as stakeholders applies equally to banks:

> "An inevitable and normal risk of the insurance business is the possibility of conflicting claims to the proceeds of a policy. An interpleader action relieves the company of this risk by eliminating the potential harassment and expense of a multiplicity of claims and suits. * * * It thus seems unreasonable to award an insurance company fees for bringing an action which is primarily in its own self-interest."

12. Likewise, the Court also denies an award of attorney's fees and/or costs to the Trustee and Cass. An award of fees and costs against a stakeholder is improper in the absence of a finding that the stakeholder's conduct has been improvident, vexatious, or otherwise improper, and this Court finds as a matter of fact and law that Central National Bank of San Angelo has not engaged in conduct of this nature. *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1164 (5th Cir.1976). In *Murphy*, a panel of the Fifth Circuit commented on the taxing of fees and costs against a stakeholder as follows:

> "Of course, this court agrees that the decision to award such costs is generally an equitable matter entrusted to the sound discretion of the trial court; however, it does not follow that the court may likewise utilize its equitable discretion to tax costs *against a stakeholder*, particularly where the stakeholder has not been found to be dilatory or otherwise guilty of bad faith. Assuming arguendo that it might sometimes be appropriate to award costs to the claimants and against the stakeholder, such an award should be limited to those cases where the trial judge concludes, by way of specific factual findings, that the stakeholder's conduct with respect to the interpleader action was improvident, vex-

atious, or otherwise improper, if not in bad faith." (emphasis ours)

13. Accordingly, the Court will enter Judgment based upon the foregoing discussion directing the Bank to turnover all funds in the Accounts to the Trustee. The Trustee is further entitled to pre-judgment interest on the interplead funds from September 20, 1985 through the date of Judgment until paid at the Texas statutory rate for pre-judgment interest. All requests for an award of attorney's fees and/or costs by any party are denied. Cass, the Trustee and the Bank are instructed to confer and prepare a form of Judgment to be submitted to the Court within ten (10) days from the date of this Memorandum of Decision.